REVISED, March 16, 1998

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 97-40236

UNITED STATES OF AMERICA,

Petitioner-Appellee,

versus

MELVIN RAY PAIGE,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Texas

March 9, 1998

Before EMILIO M. GARZA, STEWART, and DENNIS, Circuit Judges.

STEWART, Circuit Judge:

Melvin Ray Paige ("Paige") appeals his conviction, entered pursuant to a conditional plea of guilty, for possession of marijuana with intent to distribute. He alleges that the district court incorrectly denied his motion to suppress marijuana that was discovered in an attic space above an enclosed room within his home's detached garage. Conceding that the marijuana was initially discovered during a private-party search, but emphasizing that one of the private parties who made the initial discovery was an off-duty deputy sheriff, Paige contends that his Fourth Amendment rights were violated when Detective Robert Croft ("Croft") subsequently conducted a warrantless viewing of the marijuana and then effected its seizure. Further, Paige argues that the consent form that he signed, which was presented to him after Croft's initial viewing but before the marijuana was hauled

away, did not cure this Fourth Amendment violation.[1]  We find that Detective Croft's initial observation of the marijuana did not rise to the level of a Fourth Amendment search, and that his warrantless seizure of the marijuana was reasonable under the circumstances.  We therefore affirm the district court's denial of Paige's motion to suppress.

**I.**

On August 21, 1996, Paige was indicted for federal drug infractions on two counts: (1) conspiracy to distribute and possess with the intent to distribute marijuana in violation of 21 U.S.C. § 846 and (2) possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). After a hearing, the district court denied Paige's motion to suppress over 46 pounds of marijuana that were discovered in his garage attic.  Paige pled guilty to Count 2 of the indictment -- reserving his right to appeal the denial of his suppression motion -- and received a sentence of 18 months incarceration.

Testimony elicited at the suppression hearing can be summarized as follows:

Willard Cox, III ("Willard") and Jason Windell ("Windell") were employed as roofers for W.R. Cox Enterprises, a company owned and operated by Willard's father, Willard Cox, Jr. ("W.R. Cox").[2]  Pursuant to a verbal contract between Paige and the company, Willard and Windell began repairing the roof of the home of Paige and his family in Liberty County, Texas in early December 1994.  In addition to Paige's residence, Paige's property contained a detached garage, located approximately 20 to 30 feet away from (but within the same fenced-in area as) the residence, and an outbuilding (or barn) beyond the fenced-in area.  The garage contained a carport, large enough to fit two cars, and an adjoining enclosed room ("the workroom") that contained, among other things, a washer and dryer, a food freezer, and a workbench.

On December 16, 1994, when Paige was not at home, the workers inadvertently damaged a

---

[1]The consent form allowed the police to search Paige's "residence, outbuilding, [and] any motor vehicles on [the] property" and to "take . . . any things which they desire as evidence."

[2]Willard and Windell may hereinafter be referred to as "the workers" or "the roofing employees."

section of the siding on the house, and went into Paige's garage to look for additional siding to replace it. According to Willard, Paige had told them to go to the garage "if [they] needed anything." On cross-examination, Willard acknowledged that Paige had directed him and Windell to the workroom and had specifically authorized them to access the tools, sheet metal screws, and other supplies stored therein.[3]

Willard did not find replacement siding in the garage's carport or in the enclosed workroom. Returning to the carport section of the garage, he noticed an "attic space" -- similar to but smaller than a hay loft -- above the ceiling of the enclosed workroom. Gripping rafters that were approximately seven to eight feet from the floor, he hoisted himself up to a position where his shoulders were level with the ceiling joists, and looked into the space. Elevated only for "a second," he caught a glimpse of what he thought was a shiny outdoor temperature gauge. He hoisted himself up again, this time to a position where his waist was level with the ceiling joists, and noticed that the shiny apparatus was actually a scale, and that several packages, appearing to be "some type of drugs," were stored between the ceiling joists.[4] Willard then summoned Windell, who also viewed the hidden packages.

Willard decided to telephone his father, W.R. Cox, who (in addition to owning the roofing company) was employed as a Harris County (Texas) Deputy Sheriff, although he was not on duty with the Sheriff's Department that day. Willard told W.R. Cox that he needed to come out to the Paige house because Willard "had something for him to see." When W.R. Cox arrived, Willard informed him that "there was some kind of drugs" in the garage's attic.[5] W.R. Cox promptly got a ladder, climbed up to the attic space, and looked at the packages. He reached inside a white bag that

[3]The supplies had to be stored in the garage to prevent them from being exposed to moisture or rain.

[4]Willard's testimony at the suppression hearing indicated that the packages could not be seen from the floor of the carport section of the garage.

[5]There is no indication from the testimony that, prior to his arrival, W.R. Cox knew (*i.e.,* from Willard) or should have known (*i.e.*, from past police work) that Paige's property likely contained drugs.

"looked like it may be accessible" and pulled out some "green leafy looking substance," which he sniffed and believed to be marijuana. W.R. Cox's search of the attic space was conducted without a search warrant.

W.R. Cox told Willard and Windell to keep working while he went and got "some help." He went directly to an annex of the Liberty County Courthouse in Cleveland, Texas, where he informed Detective Bates ("Bates") of the Liberty County Sheriff's Department of the drugs on Paige's property. Bates contacted narcotics investigator Robert Croft ("Croft"), who in turn called the district attorney, Jerry Anders ("Anders"). Anders told Croft to meet with W.R. Cox, to proceed to Paige's property pretending to be a roofer employed by W.R. Cox's company, and to attempt to view the suspect area. Anders instructed Croft to obtain Paige's consent to search only if after this viewing he (Croft) believed the packages to contain marijuana. This rather dubious plan was concocted within a few feet of the Liberty County Justice of the Peace, who remained available during this time (in the Liberty County Courthouse annex) to consider any application for a search warrant the authorities may have wanted to proffer.

Croft met with Bates and W.R. Cox at a local school, and then W.R. Cox and Croft drove to Paige's home.[6] By this time, Paige had returned home, but he was in the barn when W.R. Cox and Croft arrived. Croft went directly to the garage, set up the ladder, climbed up, and observed the packages. He did not touch anything. This search was conducted without a search warrant. Recognizing the odor of the substance within the packages to be that of marijuana, Croft lowered himself from the ladder and proceeded to go outside to look for Paige.

Croft approached Paige in the yard as Paige was walking towards the garage from the barn, and told him that he was a narcotics detective and that he needed to speak with him about the packages in the garage. Croft's testimony reveals that Paige was aware that the garage had already been searched. After Paige allegedly said "you already know what it is" and "there's fifty pounds of

---

[6]Bates followed W.R. Cox and Croft to Paige's hom e, but remained on the road just outside Paige's property in case they needed backup.

marijuana up there," Croft officially detained him, read him his <u>Miranda</u> rights, and sought his consent to search the "house and the *other buildings* on the property." According to Croft, Paige was aware that his (Croft's) intention was to reexamine the garage. However, the written consent form procured by Croft, which Paige signed after it was read to him twice, specifically gave officers permission to search only the "residence, *outbuilding*, [and] any motor vehicles on [the] property"[7] and to "take from . . . [this] property . . . any things which they desire as evidence."[8]

Croft then went back into the garage and, with the assistance of other officers who had since arrived on the scene, photographed the packages of marijuana before they were seized and hauled away. According to Croft, Paige -- although appearing embarrassed -- remained quite cooperative throughout. Paige apparently never limited the officers' subsequent search, and even volunteered to help them take the packages down. Indeed, Paige voluntarily turned over to Croft a small quantity of personal use marijuana, which he stored in the enclosed workroom of the garage. It does not appear from the hearing testimony or the presentence report that marijuana was found elsewhere on Paige's property.

Deeming the legality of the search a "very close question," the district court denied Paige's motion to suppress "under the circumstances and evidence offered." Paige now timely appeals this denial.

## II

"A district court's ruling on a motion to suppress based upon live testimony at a suppression hearing is accepted unless clearly erroneous or influenced by an incorrect view of the law." <u>U.S. v. Wilson</u>, 36 F.3d 1298, 1303 (5th Cir. 1994). In addition, "we view the facts in the light most favorable to the prevailing party, which in this case is the government." <u>United States v. Howard</u>,

---

[7](emphasis added).

[8]Paige testified that, when he signed the consent form, he believed he was not consenting to a search of the garage because Croft "had already searched that." In addition, he claims that the form's use of the word "outbuilding" in the singular indicates that the officers were authorized to search the barn only, and not the garage.

106 F.3d 70, 73 (5th Cir. 1997) (internal quotations omitted). In this case, the district court made no findings of fact before denying Paige's motion. Although this allows us to conduct a more searching review, our analysis will be guided by the testimony and other evidence adduced at the suppression hearing. Questions of law, including whether an expectation of privacy is reasonable under the circumstances, U.S. v. Smith, 978 F.2d 171, 176 (5th Cir. 1992), cert. denied, 507 U.S. 999, 113 S.Ct. 1620, 123 L.Ed.2d 176 (1993), and whether the district court's ultimate conclusions of Fourth Amendment reasonableness are correct, Wilson, 36 F.3d at 1304, are reviewed *de novo*. United States v. Blocker, 104 F.3d 720, 724 (5th Cir. 1997).

The Fourth Amendment, made applicable to the States by way of the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), requires that the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. The Fourth Amendment clearly protects people from unreasonable searches and seizures within their homes. United States v. Richard, 994 F.2d 244, 247 (5th Cir. 1993). This court has established a two-step analysis for determining whether governmental investigative activity violates the Fourth Amendment:

> [F]irst, [we] consider whether the activity intrudes upon a reasonable expectation of privacy in such a significant way to make the activity a "search." Then, if we find a "search" has occurred, we determine whether the governmental intrusion was unreasonable given the particular facts of the case.

United States v. York, 895 F.2d 1026, 1028 (5th Cir. 1990). In addition, a governmental "seizure" of property -- that is, "some meaningful interference with an individual's possessory interest in that property," United States v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) -- is "subject to Fourth Amendment scrutiny even [if] no search within the meaning of the Amendment [takes] place." Soldal v. Cook County, Illinois, 506 U.S. 56, 68, 113 S.Ct. 538, 547, 121 L.Ed.2d 450 (1992).

The exclusionary rule requires that "evidence obtained in violation of the Fourth Amendment

6

cannot be used in a criminal proceeding against the victim of [an] illegal search . . .” United States v. Buchanan, 70 F.3d 818, 825 (5th Cir. 1995), cert. denied, 116 S.Ct. 1340, 134 L.Ed.2d 490 (1996). The facts of this case present four separate entries into Paige's garage attic that raise potential Fourth Amendment implications: (1) the initial discovery of the marijuana by Willard and Windell; (2) the subsequent search by W.R. Cox; (3) the initial search by Detective Croft; and (4) the final examination by Croft and other police officers (pursuant to which the marijuana was photographed, seized, and hauled away).

**A. LEGALITY OF SEARCHES CONDUCTED BY WILLARD, WINDELL, AND W.R. COX**

We begin our analysis by discussing what Paige does not raise on appeal. Paige wisely does not argue that the initial search by Willard and Windell violated the Fourth Amendment. It is well-settled that the protection provided by the Fourth Amendment proscribes only governmental action, and that private party searches of property, even if wrongfully conducted, do not raise Fourth Amendment implications. Blocker, 104 F.3d at 725. There is no indication from the record (1) that the government knew of or acquiesced in the intrusive conduct of Willard and Windell, and (2) that Willard and Windell intended to assist law enforcement efforts in conducting their search. See Blocker, 104 F.3d at 725 (applying this two-part test, articulated by the Ninth Circuit in United States v. Miller, 688 F.2d 652, 657 (9th Cir. 1982), to determine if a private party activates the Fourth Amendment by acting as an instrument or agent of the government in conducting the search). Willard and Windell, acting under no suspicion that drugs were contained on Paige's property, simply entered the garage as employees of a roofing company, looking for an extra piece of siding to replace the one they had damaged. Their purely private search triggered no Fourth Amendment alarm.

The same can be said about W.R. Cox's search of the attic, although for different reasons. The government maintains that the facts and circumstances clearly show that W.R. Cox was not an instrument or agent of the government when he conducted his search. As discussed, in analyzing such an argument, we have applied the two-part test articulated by the Ninth Circuit in Miller: (1) whether the government knew or acquiesced in the intrusive conduct; and (2) whether the private party

7

intended to assist law enforcement efforts or to further his own ends. Blocker, 104 F.3d at 725. In arguing that neither prong was met, the government claims that W.R. Cox had no knowledge that Paige engaged in narcotics activity prior to his viewing of the marijuana, and that W.R. Cox's sole motivation in coming to the property was to check on the welfare of his two employees (one of whom was his son). The government makes this argument knowing that W.R. Cox was informed by Willard of the marijuana as soon as he (W.R. Cox) arrived on the property (per Willard's testimony), and that W.R. Cox was an off-duty deputy sheriff at the time of the search. In addition, the government does not explain how W.R. Cox's search in any way related to his concern for the welfare of his employees. Despite our concerns in this regard, our analysis of the legality of W.R. Cox's search is severely circumscribed by the fact that Paige does not raise a Fourth Amendment objection to it.[9] As such, we are constrained to accept the government's contention that W.R. Cox's search of the attic was a private party search raising no Fourth Amendment implications.

## B. LEGALITY OF SEARCH CONDUCTED BY DETECTIVE CROFT

Paige argues that Detective Croft's initial warrantless search, conducted in his official capacity as a narcotics investigator, violated the Fourth Amendment. To resolve this issue, we turn to the first step of our well-established analysis for determining whether governmental investigative activity rises to the level of a Fourth Amendment transgression. See York, 895 F.2d at 1028.

### Did a Fourth Amendment "Search" Take Place?

"The Fourth Amendment does not provide blanket protection against searches . . . on private property. Rather, the Fourth Amendment protects [only] those areas in which . . . citizens have a *reasonable expectation of privacy*." United States v. McKeever, 5 F.3d 863, 866 (5th Cir. 1993) (citing Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)) (emphasis added). Although it no doubt can be said that our constitutional precedent on the concept of "reasonable expectation of privacy" comprises an amorphous realm, this "concept" nonetheless plays the crucial

---

[9]When asked at oral argument about which search he was arguing violated the Fourth Amendment, counsel for Paige responded that the suspect search was Croft's, not W.R. Cox's.

gatekeeping role in our inquiry, allowing us to separate that which falls within the ambit of the Fourth Amendment from that which does not. Only if "[governmental] activity intrudes upon a reasonable expectation of privacy in a significant way" does the activity constitute a "search" for Fourth Amendment purposes. York, 895 F.2d at 1028. Moreover, "[a] subjective expectation of privacy does not, by itself, give rise to Fourth Amendment protection[;]" rather, "the expectation of privacy must be one that society is prepared to recognize as reasonable." Smith, 978 F.2d at 177.

Generally speaking, the "right to privacy in the home is certainly a reasonable expectation." York, 895 F.2d at 1029. "Indeed, the right to be free from unreasonable government intrusion into one's own home is a cornerstone of the liberties protected by the Fourth Amendment." Id. (citing Payton v. New York, 445 U.S. 573, 583-89, 100 S.Ct. 1371, 1378-82, 63 L.Ed.2d 639 (1980)). However, the protection granted the home is not unassailable, and we have noted, for example, that home occupants lose their expectation of privacy in those portions of the home (and the activities taking place therein) that can be observed from outside the premises through undraped windows. York, 895 F.2d at 1029. Other similar "activities of [a] home's occupants[,]" creating comparable reasonably foreseeable "risk[s] of intrusion," id. (internal quotations omitted), such as leaving doors open, likewise compromise any reasonable expectation of privacy. In addition, we have noted that "activities or circumstances within a dwelling [itself]" may also lessen an occupant's privacy expectation, provided that such activities or circumstances create a "risk of intrusion [that] is reasonably foreseeable." Id. (internal quotations omitted) (citing United States v. Bomengo, 580 F.2d 173 (5th Cir. 1978), cert. denied, 439 U.S. 1117, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)).

In York, we held that no Fourth Amendment "search" took place within a home when police, responding to a guest's request for help in dealing with an intoxicated and belligerent homeowner, entered the home as "community caretak[ers]" to assist the guest in removing his (and his family's) possessions and noticed several illegal firearms in plain view. York, 895 F.2d at 1029-30. Because the guest had been invited to stay in the house, we found that the homeowner's threatening behavior, combined with the guest's occupancy, made it reasonable for the guest to secure the help of police

9

in removing his possessions from the home. Id. Given that the police intrusion was a reasonably foreseeable intrusion (based on the activities and circumstances existing within the home at the time), the homeowner no longer possessed a reasonable expectation of privacy in the area where the police observed the firearms in plain view. Id.

We confronted similar factual circumstances, with a slight twist, several years ago in Bomengo. In that case, the chief engineer of an apartment complex noticed a large water leak (*i.e.,* a "circumstance within a dwelling") originating from a temporarily unoccupied apartment. After attempting unsuccessfully to locate the apartment's occupant (Bomengo), the engineer entered the apartment to investigate whether Bomengo was sick or disabled inside and to check on the severity of the water leak. In the course of conducting these duties, the engineer observed, two illegal firearms in plain view within an open closet, prompting him to contact the apartment complex security guard. The guard then summoned a police detective, who entered the apartment with the engineer and observed the firearms in the same position in which the engineer had previously discovered them. Acknowledging as long-recognized the proposition that "a police view subsequent to a search conducted by private citizens does not constitute a 'search' within the meaning of the Fourth Amendment so long as the view is confined to the scope and product of the initial search," Bomengo, 580 F.2d at 175, we held that the police detective's viewing of the firearms did not implicate the Fourth Amendment.[10]

The government argues in the instant case that Detective Croft's inspection of the attic space was not a "search" under the Fourth Amendment, because its scope was limited to that of the search conducted by private parties Willard and Windell (*i.e.*, a mere viewing) and clearly did not extend to the lengths of the examination conducted by private party W.R. Cox (*i.e.*, a touching of the marijuana). In addressing this argument, we note that our decision in Bomengo, although acknowledging that a prior private-party search may frustrate one's reasonable expectation of

---

[10]The Bomengo court did note that the detective, after viewing the guns, obtained a warrant before seizing them. Bomengo, 580 F.2d at 176. However, the court did not express an opinion as to whether the warrant was a necessary predicate to the seizure.

10

privacy, hinged on the fact that the initial entry -- pursuant to which the private-party viewing occurred -- was a "reaso nably foreseeable intrusion of privacy," <u>Bomengo</u>, 580 F.2d at 176, occasioned by the particular "circumstances within the dwelling" at the time. <u>York</u>, 895 F.2d at 1029. Generally speaking, entries into apartment units by apartment maintenance personnel, when made necessary by emergency situations, are by no means unforeseeable intrusions when they occur. Consequently, in <u>Bomengo</u>, given that the firearms were left in plain view, Bomengo no longer possessed a reasonable expectation of privacy in their viewing after the engineer's initial search. "Because the [subsequent] police view was confined strictly to the scope of the initial review," <u>Bomengo</u>, 580 F.2d at 176, and thus "infringed" only upon that portion of Bomengo's expectation of privacy that had already reasonably been frustrated, we were compelled to hold that  no "search" within the Fourth Amendment had taken place.

In <u>Bomengo</u>, we also had occasion to survey the line of decisions that preceded our holding in that case.  <u>Id</u>. at 176; <u>see</u> <u>Barnes v. United States</u>, 373 F.2d 517 (5th Cir. 1978) (motel owner searched defendant's travel bag after it was inadvertently left behind and found suspicious checks; no Fourth Amendment search where police subsequently examined contents of bag); <u>United States v. Blanton</u>, 479 F.2d 327 (5th Cir. 1973) (airline employees, after opening defendant's unidentifiable, unclaimed baggage in an effort to determine ownership, found an illegal firearm; no Fourth Amendment search where police subsequently reopened and inspected baggage); <u>United States v. McDaniel</u>, 574 F.2d 1224 (5th Cir. 1978), <u>cert. denied</u>, 441 U.S. 952, 99 S.Ct. 2181, 60 L.Ed. 1057 (1979) (same factual scenario as <u>Blanton</u>).  The common denominator among these cases is easily identified: in each, either the "activities" or conduct of the defendant (*i.e.,* inadvertently leaving travel bags behind or failing to timely claim unidentifiable baggage) and/or the "circumstances" of the situation (*i.e.*, apartment employees trying to stop a water leak or airline employees attempting to find rightful owner of bags) significantly lessened the defendant's reasonable expectation of privacy "by creating a risk of intrusion [by private parties] which [was] reasonably foreseeable." <u>York</u>, 895 F.2d at 1029.  Therefore, the subsequent police search in each case, limited in scope to the initial private

11

search, did not rise to the level of a Fourth Amendment "search."

Based on the foregoing discussion, we realize that the facts of the instant case implicate two principles within our precedent on "reasonable expectations of privacy," which, when applied to this case, create considerable tension. On the one hand, we have noted that occupants have a "heightened interest of privacy associated with being free from intrusion in [their] home." Fontenot v. Cormier, 56 F.3d 669, 674 (1995); see also York, 895 F.2d at 1029. This principle, however, is tempered by our observation that a prior private-party search of an area ordinarily frustrates one's expectation of privacy therein, such that a subsequent police search, limited in scope to the private-party search, does not cause us much concern. See Bomengo, 580 F.2d 175-76.

In an attempt to synthesize these principles, and in light of our decisions in Bomengo and York, we find that the proper Fourth Amendment inquiry, when confronted with a police search of a home that extends no further than a previously-conducted private party search, is to determine whether the homeowner or occupant continues to possess a reasonable expectation of privacy after the private search occurs. In making this determination, consideration must be given to whether the activities of the home's occupants or the circumstances within the home at the time of the private search created a risk of intrusion by the private party that was reasonably foreseeable. If indeed the private party's intrusion was reasonably foreseeable (based on such activities or circumstances), the occupant will no longer possess a reasonable expectation of privacy in the area or thing searched, and the subsequent police search *will not* trigger the Fourth Amendment. If, however, the private party's initial intrusion was not reasonably foreseeable, the occupant's reasonable expectation of privacy will survive, and the subsequent police search *will* indeed activate the Fourth Amendment.[11]

---

[11]In United States v. Jacobsen, 466 U.S. 109, 104 S.Ct.1652, 80 L.Ed.2d 85 (1984), the Supreme Court was likewise called upon to evaluate the actions of a law enforcement official who was presented with evidence uncovered during a prior private-party search. In that case, employees of Federal Express had torn open a package that had been inadvertently damaged. Observing a white powdery substance, they called a federal law enforcement agent who, acting without a warrant, removed a trace of the substance and determined that it was cocaine. The Court stated that "[t]he additional invasions of . . . privacy by the government agent must be tested by the scope of the private search." Jacobsen, 466 U.S. at 115, 104 S.Ct. at 1657. In holding that the agent's actions did not rise to the level of a "search," the Court noted that the package could "no longer support any

12

In the instant case, both Paige's conduct and the circumstances of the situation created a risk of intrusion into his garage's *attic* that was reasonably foreseeable. Paige himself had hired W.R. Cox Enterprises to repair his roof, and the roofing employees' search for siding began only after they inadvertently damaged the side of his home. Accidents of this type, related to the task at hand and arising contemporaneously therewith, are reasonably expected to occur. Given Willard's testimony that "a lot of people keep [siding] around," we find it no surprise that he immediately began to look for replacement siding. According to the unchallenged testimony of Willard, Paige had advised the workers that they could go into the garage if they needed "anything;" moreover, Paige had specifically directed the workers to the garage and pointed out various tools and supplies they could access. Collectively, Paige's actions in this regard authorized the workers to enter the garage for any purpose *related to their roofing task*, including, *inter alia*, the securing of materials to replace damaged siding. Given that Willard's entry into the garage was thus sufficiently justified, we do not find unreasonable Willard's decision to explore the attic, as it was rational to believe that siding could be stored there. Under the foregoing facts, we find that Willard's discovery of the marijuana, and the subsequent searches by Windell and W.R. Cox, stripped Paige of his reasonable expectation of privacy in the garage attic. Both the conduct of Paige, and the circumstances of the situation, made

expectation of privacy, and . . . *it was virtually certain that it contained nothing but contraband*." Jacobsen, 466 U.S. at 120 n.17, 104 S.Ct. at 1660 n.17 (emphasis added).

　　　The government has previously argued, before another Circuit court, that Jacobsen requires application of a mechanical rule: that a police officer's search is constitutionally permissible so long as his search does not exceed the scope of a prior private-party search. See United States v. Allen, 106 F.3d 695, 699 (6th Cir. 1997). Much like the Allen court did, however, we find Jacobsen distinguishable on its facts.

　　　"Unlike the package at issue in Jacobsen, which contained 'nothing but contraband,'" id., people's homes contain countless personal, non-contraband possessions. Certainly, a homeowner's legitimate and significant privacy expectation in these possessions cannot be entirely frustrated simply because, *ipso facto,* a private party (*e.g.,,* an exterminator, a carpet cleaner, or a roofer) views some of those possessions. See Allen, 106 F.3d at 695. Because Jacobsen was concerned primarily with measuring "the scope of a private search of a mail package, the entire contents of which were obvious," Allen, 106 F.3d at 699, we agree with the Allen court's decision not to extend Jacobsen's holding "to cases involving private searches of residences." Allen, 106 F.3d at 699. A decision any other way would make the government the undeserving recipient of considerable private information of a home's contents strictly through application of an inflexible rule. We refuse to reward the government with such a windfall, and find the appropriate analysis in home search cases to be the one identified in the text above.

13

these intrusions reasonably foreseeable. Consequently, we find that Detective Croft's subsequent examination of the attic did not qualify as a "search" for Fourth Amendment purposes.

## C. LEGALITY OF SEIZURE OF MARIJUANA BY DETECTIVE CROFT AND OTHER POLICE OFFICERS

Paige next contends that Croft violated his Fourth Amendment rights by not securing a warrant before the marijuana was seized and hauled away. The Supreme Court recently made clear that the protection afforded by the Fourth Amendment extends to an individual's possessory interests in property, even if his expectation of privacy in that property has been completely extinguished. Soldal, 506 U.S. at 62-63, 113 S.Ct.. at 544. Indeed, "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." Id. at 68, 113 S.Ct. at 547; see also Jacobsen, 466 U.S. at 113, 104 S.Ct. at 1656 (defining "seizure" of property as "some meaningful interference with an individual's possessory interests in that property"). Although it has been established that Paige's privacy interest in the marijuana had been extinguished prior to its seizure, see supra discussion, his possessory interest in it continued to survive. As such, the government's seizure of the marijuana invoked the protections of the Fourth Amendment.

Determining whether the Amendment was in fact violated, however, is a different question, and requires the weighing of various factors to ascertain the reasonableness of the government's conduct. Generally, "seizures conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well delineated exceptions." Minnesota v. Dickerson, 508 U.S. 366, 372, 13 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993) (internal quotations and citations omitted). Here, the government argues that the seizure of the marijuana was excused from the warrant requirement because it met all the dictates of Fourth Amendment reasonableness expressed in Jacobsen, 466 U.S. at 120-22, 104 S.Ct. at 1660-61.

In Jacobsen, as discussed supra note 11, Federal Express employees tore open a package that had been inadvertently damaged. Observing plastic bags containing a white powder, they contacted

14

a federal agent, who -- after arriving without a warrant -- removed the plastic bags from the box and performed a field test on its contents, which proved to be cocaine. Acknowledging that the agent's "assertion of dominion and control over the package and its contents . . . consitute[d] a 'seizure,'" id. at 120, 104 S.Ct. at 1660, the Court nonetheless found the seizure to be reasonable under the circumstances. The Court first reasoned that "the package could no longer support any expectation of privacy" and that such packages "[can] be seized, at least temporarily, without a warrant." Id. at 121, 104 S.Ct. at 1660-61. In addition, the Court noted that "it was apparent that the . . . bags contained contraband and little else" and t hat law enforcement officials may make warrantless seizures of "'effects' that cannot support a justifiable expectation of privacy . . . , based on probable cause to believe they contain contraband." id. at 122-22, 104 S.Ct. at 1661.

Against this backdrop, the government claims that the prior conduct of Willard, Windell, W.R. Cox, and Croft, as well as Paige himself (*i.e.*, "there's fifty pounds of marijuana up there"), extinguished any privacy interest Paige had in the marijuana. We have accepted this contention above. Moreover, we acknowledge that probable cause to believe the packages contained marijuana existed, as the attic had been viewed by W.R. Cox and Detective Croft, the latter being an experienced narcotics investigator. Because Paige no longer possessed a privacy expectation in the marijuana, and "it was apparent that the [packages] contained contraband and little else," the government concludes that Jacobsen sanctified the warrantless seizure executed in this case.

We disagree with the government's argument, and in so doing, refuse to extend the holding in Jacobsen to cases involving permanent seizures. Unlike the seizure at issue in Jacobsen -- which was designed only to be a temporary one for the purpose of investigating, seizing, and testing the package's contents -- the seizure in the instant case was intended to be permanent from the outset. That the holding in Jacobsen was not intended to apply to permanent seizures -- but only to temporary investigatory detentions of property -- is made clear by the language used by the Court: "Such containers [*i.e.*, ones having no justifiable expectation of privacy] may be seized, *at least temporarily*, without a warrant[,] . . . based on probable cause to believe they contain contraband."

15

Id. at 121, 104 S.Ct. at 1662 (emphasis added); see also United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (finding that temporary, warrantless investigative detentions of luggage are justified under the Fourth Amendment, provided they are based at a minimum on a reasonable, articulable suspicion that the luggage contains contraband). Our interpretation of Jacobsen is consistent with its facts, as the officer in that case seized the package only for the time necessary to observe the bags contained therein and to perform a field test on a trace amount of the contents. After the test was completed, the package was rewrapped, a warrant was obtained to search the place to which it was addressed, and the warrant was executed. Jacobsen, 466 U.S. at 112, S.Ct. at 1656. Although it is quite possible that the results of a temporary seizure may thereafter justify a more permanent seizure, see Place, 462 U.S. at 708-11, 103 S.Ct. at 2645-47, the Jacobsen Court did not address this possibility (with respect to the package at issue therein), and the government does not make that argument here.[12] As such, Jacobsen, which evaluated the reasonableness of an officer's warrantless, temporary seizure of a package, is distinguishable on its facts, and we refuse to apply it to the permanent seizure executed in this case.

We nonetheless find the government's permanent seizure of the marijuana in this case justified under the plain view doctrine. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." Horton v. California, 496 U.S. 128, 134, 110 S.Ct. 2301, 2307, 110 L.Ed.2d 112 (1990) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971)). The Supreme Court has explained that the plain view doctrine "reflects an application of the Fourth Amendment's central requirement of reasonableness to the law governing seizures of property." Soldal, 506 U.S. at 64, 113 S.Ct. at 546.

To ensure that the protections guaranteed by the Fourth Amendment are not eviscerated by the plain view doctrine, see Coolidge, 403 U.S. at 465, 91 S.Ct. at 2037 ("[I]t is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at

---

[12]In fact, the government has not made the claim, nor does the record support, that the seizure in this case was a temporary one.

16

least at the time of seizure."), the Supreme Court has identified several conditions that must be satisfied before a plain view seizure of an object is upheld: (1) the officer conducting the seizure must lawfully arrive at the position from which the object is plainly seen; (2) the object must be in plain view; (3) the object's incriminating character must be immediately apparent--*i.e.*, the officer must have probable cause to believe the object is contraband or evidence of a crime; and (4) the officer must have a lawful right of access to the object itself. Horton, 496 U.S. at 136-37, 110 S.Ct. at 2307-08; Dickerson, 508 U.S. at 374-75, 113 S.Ct. at 2136-37; see also Buchanan, 70 F.3d at 825. After carefully reviewing the record, we find that each of these elements was satisfied in this case.

As explained above, we are satisfied that Detective Croft did not violate the Fourth Amendment in reaching the place from which the marijuana could be seen. While making this determination ordinarily involves analyzing whether a warrant or an exception to the warrant requirement justified the officer's arrival at the "plain-viewing" position, we see no reason why this factor should not be applied literally to the unique factual circumstances of this case. Detective Croft's initial "plain" viewing of the marijuana sufficiently fell within the protective umbrella of the prior private-party searches.

Photographs of the attic introduced at trial show that Croft observed numerous packages -- wrapped in an opaque, cellophane-like covering -- aligned between the ceiling joists, and a scale stationed nearby. As the storing of marijuana in this manner is to be expected -- *i.e.*, rarely will the police come upon such a large quantity of marijuana and find it bare and unwrapped -- we find that a further search of the packages to verify their contents was unnecessary -- especially in light of the fact that the officer making the plain view was an experienced narcotics investigator who recognized the smell in the attic to be that of marijuana. In short, the packages were sufficiently exposed for the plain view doctrine to apply.

The next requirement for a valid plain view seizure is that the incriminating nature of the evidence must be immediately apparent, such that it gives rise to probable cause. Buchanan, 70 F.3d at 825-26 (citation omitted). "Probable cause does not require certainty[,] . . . and in reviewing

17

probable cause determinations, we must consider the totality of the circumstances -- including the officers' training and experience as well as their knowledge of the situation at hand." Id. (citations omitted). Here, Detective Croft was an experienced narcotics investigator working for the narcotics division of the Liberty County Sheriff's Department. Prior to his arrival at Paige's property, he was informed by W.R. Cox that Paige's attic likely contained marijuana. Croft's testimony reveals that as soon as he got to the top of the ladder, he recognized that he was viewing "compacted, packaged marijuana for transport." Under these circumstances, we find that Detective Croft had probable cause to seize the packages of marijuana when he observed them.

The final requirement for a plain view seizure is that the officer have a rightful access to the evidence. One Circuit has stated that this prong of Horton is "best understood as emphasizing that even though contraband plainly can be seen and identified from outside the premises, a warrantless entry into those premises to seize the contraband would not be justified . . . ." G & G Jewelry, Inc. v. City of Oakland, 989 F.2d 1093, 1101 (9th Cir. 1993). This "factor[, therefore,] is [ordinarily] implicated in situations such as when an officer on the street sees an object through the window of a house, or when officers make observations via aerial photography or long-range surveillance. In those cases, the officers cannot use the plain view doctrine to justify a warrantless seizure, because to do so would require a warrantless entry upon private premises." United States v. Naugle, 997 F.2d 819, cert. denied, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (10th Cir. 1993).

Although our decision in United States v. Whalley, 781 F.2d 417 (5th Cir. 1986), predates the Supreme Court's holding in Horton, our reasoning therein is consistent with current interpretations of this factor. In Whalley, we held unlawful a warrantless seizure of marijuana growing on the curtilage of a home, despite the fact that an officer saw the marijuana in plain view from a lawful position on an adjacent road. Although it was unclear whether the officer had made a positive identification of the marijuana prior to his entry onto the property, our holding was not based on this factor. Instead, we observed that a warrantless seizure of objects from a residence is not authorized "upon the mere off-premises sighting of on-premises contraband," Whalley, 781 F.2d

18

at 420, and that there is a rightful distinction made "between the seizure of property in plain view where there is no invasion of privacy and the situation where the sighted contraband is situated on private premises to which access is not otherwise available for the seizing officer." Id. at 421 (quotations and citations omitted).

In the instant case, not only did the marijuana no longer support an expectation of privacy, but Detective Croft's presence on the premises -- up to and including his viewing of the marijuana -- was lawful under the umbrella of the prior private-party searches. Consequently, we find that Detective Croft had a rightful access to the packages of marijuana. All the necessary conditions for a plain view seizure having been satisfied, the seizure of the forty-six (46) pounds of marijuana from Paige's attic was reasonable under the circumstances.

In summary, we hold that (1) Detective Croft's initial viewing of the marijuana did not rise to the level of a Fourth Amendment search, and (2) the officers' subsequent seizure of the marijuana, although not justified under the Supreme Court's holding in Jacobsen, was valid under the plain view doctrine.[13] Therefore, the district court did not err in denying Paige's motion to suppress.

### III

Based on the foregoing reasons, we AFFIRM Paige's conviction for possession of marijuana with intent to distribute.

---

[13]Because we find that the warrantless seizure of the marijuana from the garage was justified under the plain view doctrine, we need not decide whether the government's consent form -- which (1) was presented to Paige *after* the marijuana had already been viewed, and (2) in relevant part, only authorized seizure of evidence from the *outbuilding* -- was valid.