United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 18, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 03-30786

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RODNEY SANTIAGO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

Before KING, Chief Judge and DEMOSS and STEWART Circuit Judges.

CARL E. STEWART, Circuit Judge:

Appellant Rodney Santiago ("Santiago") appeals from the district court's denial of his motion

to suppress firearms discovered in a search of his residence and a written statement, which resulted

in his conditional guilty-plea conviction for two counts of possession of a firearm by a convicted felon

in violation of 18 U.S.C. §§ 922(g)(1)[1] and 924(a)(2)[2].  For the reasons set forth below, because we

---

[1] This statute provides in pertinent part:
 It shall be unlawful for any person – who has been convicted in any court of,
 a crime punishable by imprisonment for a term exceeding one year;

1

find that the search of the home was lawful and the written statement was voluntarily rendered, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Santiago had previously been convicted of a felony punishable by imprisonment exceeding one year. On September 12, 2002, the search for a burglary suspect named Danny Rossignol ("Rossignol") led deputies of the Jefferson Parish Sheriff's Office to Santiago's residence because Santiago had fenced stolen goods for Rossignol in the past. When the deputies arrived at his residence, Santiago opened the door allowing them to enter. Upon entering the residence, the deputies observed a firearm in plain view on a mantle in an adjacent room. Santiago acquiesced to the deputies request to search his home for items that Santiago may have received from Rossignol. During the search the deputies discovered two more firearms. One of the firearms present was identified as one of the items stolen by Rossignol. The deputies also recovered a television set, video tapes and a tool set, which also had been stolen by Rossignol.

In order to encourage Santiago to sign a written statement drafted by the deputies which stated that Santiago had purchased the stolen firearm and other items from Rossignol, and had possessed all three firearms, the deputies promised Santiago that he would not be arrested. They told Santiago that their focus was on Rossignol, and never informed Santiago of his rights under Miranda

to . . .possess . . .any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

[2] This statute provides in pertinent part:
Whoever knowingly violates subsection . . . (g) . . . of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both.

2

v. Arizona, 384 U.S. 436, 444 (1966).[3] Santiago told the deputies that he knew that he was not allowed to possess any firearms due to his previous conviction.

A few days after the search, the deputies turned over the three firearms seized to the Federal Bureau of Alcohol, Tobacco and Firearms ("ATF"). A federal warrant was then issued for Santiago's arrest. While in the process of being arrested by the U.S. Marshals at his residence, an additional firearm was discovered and seized from Santiago's home. Santiago was then indicted on two counts of possession of a firearm by a felon in violation of §§ 922 (g) (1) and 924 (a)(2).

Santiago moved in district court to suppress all the evidence seized by the deputies and the U.S. Marshals during the searches of his residence, and the written statement, asserting that the searches were illegal and that the statement he had given was involuntary. Santiago asserted that he did not consent to the deputies entry into and search of his home. He contended that because the search of his home was illegal, the three firearms seized by the deputies, and the additional firearm seized by the Marshals, should have been excluded as fruit of the poisonous tree of the illegal search. Santiago further argued that the written statement was obtained under false pretenses and was not voluntary because the deputies falsely informed him that the statement would not be used against him and that he would not be arrested.

The district court found no violation of Santiago's Fourth Amendment rights and rendered its oral reasons and order denying his motion to suppress at the conclusion of an evidentiary hearing. The district court did not issue written reasons or an order. The district court asked whether there was a valid invitation to enter the residence, and once inside, was there a valid consent to search the

---

[3] These include the right to remain silent, and a warning that any statements made by a suspect could be used against him in a prosecution.

3

residence. The district court noted that while the deputies had not advised Santiago of his Miranda rights, any potential taint of the search was removed by Santiago's testimony at the hearing that he was familiar with his rights. The district court stated that without this testimony, it would have admitted only the firearm found in plain view by the deputies upon their entry into Santiago's home. Santiago entered a conditional guilty plea to both counts of the indictment, reserving his right to appeal the district court's denial of his motion to suppress. The district court sentenced him to sixty months imprisonment as to both counts, to run concurrently, followed by three years supervised release as to both counts, to run concurrently. Santiago filed a timely notice of appeal.

## STANDARD OF REVIEW

In reviewing a district court's denial of a defendant's motion to suppress, this court reviews factual findings, including credibility choices, for clear error, while we review legal conclusions *de novo*. United States v. Solis, 299 F.3d 420, 435 (5th Cir. 2002); United States v. Foy, 28 F.3d 464, 474 (5th Cir. 1994). Where a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses. Solis, 299 F. 3d at 436; Foy, 28 F.3d at 474. We review the evidence in the light most favorable to the prevailing party, which in this case is the government. Solis, 299 F. 3d at 436. If the record supports more than one permissible interpretation of the facts, the reviewing court will accept the district court's choice between them, absent clear error. United States v. Posada-Rios, 158 F.3d 832, 868 (5th Cir. 1998).

## DISCUSSION

I.      Preservation of appeal

Santiago argues that the district court erred in denying his motion to suppress without making

factual findings to support its ruling. The government responds that Santiago's conditional guilty plea did not preserve for appeal this particular argument. Because Santiago did not raise this objection prior to filing his appeal, the government argues that he waived it. We disagree with the government.

A defendant may preserve the right to appeal an adverse ruling on a pretrial motion by entering a conditional plea. See Fed. R. Crim. P. 11 (a) (2). A conditional guilty plea must be written, consented to by the government, and approved by the district court. Id. We have held that the writing must state explicitly the particular issues preserved for appeal. United States v. Wise, 179 F.3d 184, 186-87 (5th Cir. 1999). However, we have also held that we will excuse a defendant's failure to comply with the writing requirement of Rule 11 (a) (2) if the record demonstrates that the spirit of the rule has been fulfilled. Id. at 187; see also Fed. R. Crim. P. 11(h) (providing that any variance from the procedures required by Rule 11 which does not affect substantial rights shall be disregarded). Furthermore, a plea will be considered conditional if the record clearly indicates that the defendant intended to enter a conditional guilty plea, that the defendant expressed the intention to appeal a particular pretrial ruling, and that neither the government nor the district court opposed such a plea. Wise, 179 F.3d at 187.

Our review of the re-arraignment hearing transcript clearly shows that Santiago expressly intended to reserve his right to appeal the district court's denial of his suppression motion. The district court acknowledged Santiago's reservation of his right to appeal several times throughout the course of that hearing. The government eventually withdrew its initial objections to Santiago's reservation of his right to appeal under a conditional guilty plea. The record also shows handwritten revisions made on the factual basis sheet submitted by the government which specifically states that Santiago reserves his right to challenge the factual findings later on appeal. Finally, the district court

at the re-arraignment hearing stated that it was not necessary for Santiago to refer to the written statement in the factual basis in order to preserve his right to appeal its admissibility. Thus, we find that the record reflects that Santiago entered a conditional guilty plea that preserved his right to appeal all aspects of the district court's denial of his motion to suppress, including any failure by the district court to make credibility determinations.

II.     Rule 12(d) - required factual and credibility determinations

Santiago argues that the district court, in order to discern whether he had consented to the deputies' entry and subsequent search of his home, should have expressly determined which witnesses' testimony was credible. Santiago also argues that the district court should have expressly ruled on whether his signed statement was given voluntarily.

Rule 12(d) states that when a ruling on a pretrial motion requires the district court to decide factual issues, the district court must state its essential findings supporting its ruling on the record. Fed. R. Crim. P. 12 (d). Santiago correctly notes that the district court's oral ruling denying his suppression motion did not expressly set forth its factual or credibility determinations. He also points to the following statement made by the district judge during the suppression hearing to assert that the required factual and credibility determinations have not been made:

> I realize there's a dispute as to the fact concerning whether or not Mr. Santiago gave permission to enter and whether or not he gave consent, and whether or not the signing of the statement was coercive or not. Those are issues that can be addressed at trial. The jury can be given the right and special verdict questions to decide to what extent, if any, his actions . . . under the circumstances were voluntary.

Nonetheless, our review of the suppression hearing transcript reveals that the district court initiated comprehensive questioning and discussion involving the issues now on appeal. While the

6

district court's statement above may give the appearance that the required factual or credibility determinations were not made, this court may nonetheless independently review the record to determine whether the district court's decision is supported by "any reasonable review of the evidence." United States v. Yeagin, 927 F.2d 798, 800 (5th Cir. 1991). Furthermore, because credibility determinations are for the district court, this court assumes that the district court accepted the version of events offered by the government's witnesses when it conflicts with the version offered by defense witnesses in denying a defendant's suppression motion. See United States v. Smith, 543 F.2d 1141, 1145 (5th Cir. 1976).

III.    Consent to entry and search

A warrantless entry into and search of a dwelling is presumptively unreasonable unless consent is given or probable cause and exigent circumstances justify the encroachment. United States v. Jones, 239 F.3d 716, 719 (5th Cir. 2001). Here, neither probable cause nor exigent circumstances have been asserted by the government as justifying the warrantless entry into and search of Santiago's home. Rather, the government contends that Santiago gave the deputies consent to enter and search his home. Santiago disputes this contention.

In order to satisfy the consent exception, the government must prove, "by a preponderance of the evidence," that "consent to the search was freely and voluntarily given." Solis, 299 F.3d at 436 (quoting United States v. Gonzales, 121 F.3d 928, 938 (5th Cir. 1997)). "The voluntariness of consent is a question of fact to be determined from a totality of the circumstances." Id. (quoting United States v. Cooper, 43 F.3d 140, 144 (5th Cir. 1995)). This court considers six factors in evaluating the voluntariness of consent to search, all of which are relevant, but no one of which is dispositive or controlling. Id. (citing United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993)).

7

Those six factors are: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." Id. (quoting United States v. Olivier-Becerril, 861 F.2d 424, 426 (5th Cir. 1988)). The consent, however, may not be given "simply in acquiescence to a claim of lawful authority." Id. (quoting United States v. Lopez, 911 F.2d 1006, 1010 (5th Cir. 1990)).

Our independent review of the record reveals the following evidence supporting a finding that Santiago consented to the deputies entry into and search of his home:

The deputies testified that -

- When the deputies knocked on Santiago's door and identified themselves as police, Santiago opened his front door and invited them into his home without being asked;

- One of the deputies then asked Santiago for permission to search his home for the items that he had purchased from Rossignol and Santiago agreed;

- As the deputies were searching the house, Santiago, on his own and in a very cooperative manner, pointed out or brought the items he purchased to the deputies including a Taurus 38 Special.

Santiago testified that -

- When the deputies knocked on his door and identified themselves as police, he opened the door;

- He is familiar with his Miranda rights based on a criminal record going back to 1964;

- The deputies never stated that they would kick down the door if he did not open it.

Record evidence which could be read as supporting Santiago's assertion that he neither invited the deputies into his house, nor consented to the search is as follows:

8

The deputies testified to the following -

- Their search lasted for forty-five minutes because the house was very cluttered;

Santiago's brother, Ulysses, testified that -

- He went to see Santiago on September 12, 2002, and the deputies made him wait outside for approximately forty-five minutes;

- Santiago normally kept the house very clean and in order, but when he entered it after the deputies had left, he noticed that the house looked ramshacked, with things thrown around, looking as if it had been searched.

Santiago testified that -

- While he did open the door when the deputies knocked and identified themselves, he did not invite them in, but rather, one of the deputies pulled him outside and held him against the wall as the other deputies entered his house;

- He did not consent to the search of his house;

- He was not cooperative with the deputies during the search, and was not free to move around, but instead was made to sit on a sofa guarded by one of the deputies as the others conducted the search;

- When he tried to get off the sofa, one of the deputies grabbed his arm and bent it around his back, while another put a flashlight up to his neck;

- He did not reveal to the deputies where any of the stolen items were.

The fact that the deputies were in Santiago's house for forty-five minutes, which is not disputed, appears to somewhat contradict the deputies testimony of Santiago's immediate, complete and voluntary cooperation in locating the evidence at issue in this case. However, the question we must answer is whether, based on the evidence before us, the district court's assumed finding that Santiago invited the deputies into his home and consented to their search was reasonable. We find that it was reasonable. Finding ample support in the record for the district court's factual findings, we reject Santiago's claim that he did not consent to the entry and search of his home. Solis, 299

9

F. 3d at 436; Posada-Rios, 158 F.3d at 868.

IV.     The significance of our consent determination

The import of our determination that law enforcement was given consent to enter Santiago's residence is significant. Foremost, of course, is the fact that the first of the firearms recovered was observed by deputies resting in plain view on a mantle within the home. Santiago also acknowledged to law enforcement that he was aware that he had a prior felony conviction on his criminal record. The necessary determination that we must make concerns whether the discovery of the firearm implicates the plain view doctrine, which, of course, is an exception to the Fourth Amendment's Warrant Clause. See, e.g., Horton v. California, 496 U.S. 128, 134 (1990); Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971); see also United States v. Simmonds, 262 F.3d 468, 470 (5th Cir. 2001) ("It has long been established that law enforcement officers may seize anything they find in plain view without any search warrant.") (citation and internal quotation marks omitted).

We have recognized that in Horton, the Supreme Court identified several criteria that would support a finding that an inculpatory object discovered in plain view was not seized in contravention of the Fourth Amendment. See United States v. Paige, 136 F.3d 1012,1023 (5th Cir. 1998). First, the member of law enforcement who discovered the object in plain view, must have had a lawful right to be in the place where it was recovered. Id. Second, and quite obviously, the object had to have been observed in plain view. Id. Third, the inculpatory nature of the object must have been apparent, in the sense that it would immediately provide law enforcement with probable cause to believe that the object is a derivative of a crime. Id. However, the foregoing should not be interpreted too narrowly, for we have also recognized that law enforcement does not actually have to be cognizant that the object discovered is contraband, "'only that there be a practical, nontechnical probability that

10

incriminating evidence is involved.'" United States v. Hill, 19 F.3d 984, 989 (5th Cir.1994) (quoting United States v. Espinoza, 826 F.2d 317, 319 (5th Cir. 1987)). Fourth, law enforcement must have been in a position to lawfully secure access to the object. Paige, 136 F.3d at 1023.

These considerations guide our inquiry as to whether law enforcement's discovery of the firearms implicated Fourth Amendment concerns regarding the constitutionality of their seizure. We begin very simply by acknowledging that we have already determined that Santiago gave deputies consent to enter into his home, thus without belabored analysis of this first Horton consideration, we find that the deputies were lawfully within Santiago's home when the firearm was discovered. See, e.g., United States v. Cardona, 955 F.2d 976, 982 n. 15 (5th Cir. 1992); United States v. Dorr, 636 F.3d 117, 121 (5th Cir. 1981). Secondarily, it is also clear from the suppression hearing transcript that the firearm was seen in plain view. Though we do not get the sense from the record that deputies entered into the home operating under the belief that they would discover a cache of weapons, we have never asked law enforcement "to ignore the significance of items [observed] in plain view . . . ." United States v. Roberts, 619 F.2d 379, 381 (5th Cir. 1980). Moreover, it is of no great significance that the firearms were apparently discovered inadvertently. Compare United States v. Elwood, 993 F.2d 1146, 1152 (5th Cir.1993) (noting that under the plain view doctrine discovery of inculpatory evidence does not have to be inadvertent) with Roberts, 619 F.2d at 381 (inadvertent discovery of illegal paraphernalia was permissible under the plain view doctrine). Third, the incriminating character of the firearm was readily apparent, as we have often recognized the interrelatedness between the possession of firearms and criminality. See generally, e.g., United States v. Thomas, 120 F.3d 564, 570 (5th Cir. 1997); United States v. Westbrook, 119 F.3d 1176, 1192 (5th Cir. 1997). Given that the deputies went to Santiago's home because they believed that he had

11

information related to Rossignol's recent burglaries -- as Santiago had acted as a "fence" for Rossignol -- and because the deputies were also aware that Santiago had prior criminal convictions, the incriminating character of the firearm was immediately apparent. See, e.g., United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996) (observing that agents who were aware prior to entering the home of a suspect that he had prior felonies, were provided with sufficient probable cause to believe that a firearm seen in plain view constituted evidence of a § 922(g)(1) violation); see also Elwood, 993 F.2d at 1152. Fourth, and finally, we conclude that the deputies had a lawful right of access to the firearm. See Paige, 136 F.3d at 1023. We observed in Paige that this factor is "'implicated in situations such as when an officer on the street sees an object through the window of the house, or when officers make observations via aerial photography or long-range surveillance. In those cases the officers cannot use the plain view doctrine to justify a warrantless seizure, because to do so would require a warrantless entry upon private premises.'" Id. (quoting United States v. Naugle, 997 F.2d 819, 823 (10th Cir. 1993)). However, under the facts in this case, this final prong has far less importance in our plain view doctrine calculus because the gun was located in a place where the deputies had a lawful right to be. See Naugle, 997 F.2d at 823. Therefore, with the foregoing considerations addressed, we find that the discovery of the first firearm, the .38 Taurus, fell within the ambit of the plain view doctrine.

The deputies' resultant discovery of the second and third firearms, further, did not contravene any concerns implicated by the Fourth Amendment. In fact we believe that law enforcement's discovery of these remaining firearms from Santiago's home complied with well-understood constitutional principles regarding the discovery of inculpatory evidence, for as the Supreme Court recognized in Schneckloth v. Bustamonte, 412 U.S. 218 (1972), a warrantless search is clearly

12

permissible under the Fourth Amendment if law enforcement is given permission to effectuate the search in the first instance. Id. at 219. Relying on Schneckloth, we do not perceive any error with the district court's factual findings that Santiago voluntarily surrendered the second and third firearms to the law enforcement officers. Accordingly, we hold that the district court's finding that Santiago gave consent for Jefferson Parish Deputies to enter into his home was well-supported by the record, and as a consequence, the discovery and seizure of the firearms was lawful. Consequently, we find that Santiago's motion to suppress the firearms, which form the substantive basis of his felon-in-possession of a firearm conviction must be affirmed.

V.      The constitutionality of the written statement

The final issue that subsists is whether the district court erred in its refusal to suppress the written statement signed by Santiago, wherein he acknowledged that he was in possession of three firearms, which had been provided to him by Rossignol. Santiago contends that the confession was not volitional, and that he simply signed the statement because he had received assurances from the Jefferson Parish deputies that he would not be arrested if he cooperated. Therefore, we must briefly consider whether the statement -- which in essence was a confession of complicity with Rossignol – should be construed as involuntary.

A confession is voluntary if the Government proves by a preponderance of the evidence that the defendant voluntarily waived any rights against self-incrimination. See United States v. Mullin, 178 F.3d 334, 341 (5th Cir. 1999). The statement must be voluntarily, knowingly, and intelligently made, and the individual confessing must be cognizant of the rights being abandoned and the potential consequences of doing so. United States v. Ornelas-Rodriguez, 12 F.3d 1339, 1347 (5th Cir. 1994). We assess the voluntariness of a confession under the totality of the circumstances. Mullin, 178 F.3d

13

at 341. The district court's credibility and factual findings made during the suppression hearing will be reviewed for clear error, however, a question regarding whether a confession was voluntary is a legal one that is reviewed *de novo*. Id.

The Supreme Court has long held that in resolving questions related to the voluntariness of a defendant's confession, a reviewing court must look to whether the defendant's capacity to resist was overborne to such a degree that the resulting confession could not be said to be the product of the accused's own self-determination. See Rogers v. Richmond, 365 U.S. 534, 544 (1961). Moreover, the fact that certain promises may, or may not, have been made by law enforcement to secure the confession are not the sole determinant factor we evaluate in determining whether the confession will be upheld, for "[t]he Constitution does not prohibit every element which influences a criminal suspect to make incriminating admissions." United States v. Washington, 431 U.S. 181, 187 (1977). Consequently,"a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials." United States v. Bye, 919 F.2d 6, 9 (2d Cir. 1990) (citation and internal quotation marks omitted).

In this matter, it cannot be seriously argued that Santiago, with a criminal record spanning some three decades, was caught completely unaware of the consequences of providing assistance to law enforcement. Cf. United States v. Watson, 423 U.S. 411, 424-25 (1976) (recognizing that among the factors that should be considered in determining whether a defendant's consent with law enforcement was voluntary was whether the defendant had prior familiarity with the law and prior encounters with law enforcement); see also Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir. 2002 ) (countenancing the use of deception to secure a confession unless in doing so the defendant is completely unaware of the rights being abandoned). Additionally, simply because law enforcement

14

engaged Santiago in a conversation in a noncustodial environment which thereby resulted in his providing inculpatory statements -- which were transcribed in the written statement that he signed -- does not implicate serious concerns related to the constitutionality of the statement provided that we are satisfied that the statement was not ultimately the product of coercion. See Beckwith v. United States, 425 U.S. 341, 348 (1976).

Our review of the record does not indicate that Santiago's naivete compelled him to disclose that Rossignol had provided him with the three firearms. To the contrary, as a prior felon, Santiago was quite aware that he was not permitted to possess the weapons, and therefore, his voluntary cooperation was likely nothing more than a reasoned attempt to obviate the consequences of having conceded to the officers that he had served as a "fence" for Rossignol the preceding day. Notwithstanding Santiago's claim that his written statement was the product of improper inducements by the law enforcement officers, the district court rejected this claim after measuring the credibility of all the witnesses. Following a careful review of the record, we are satisfied that any assurances given to Santiago were limited and that the district court's implicit conclusion to that effect was not clearly erroneous. As such, because we do not find that the written statement was the product of either duress or any undue coercion, the district court appropriately determined that the statement was not rendered involuntarily. Therefore, the district court's denial of Santiago's motion to suppress the written statement was proper.

## CONCLUSION

Accordingly, we find that the district court's conclusion that Santiago voluntarily consented to allow Jefferson Parish Sheriff Office deputies to enter and search his residence was not clearly erroneous, and therefore affirm the denial of Santiago's motion to suppress the firearms. Similarly,

15

because we find that the written statement that was not signed by Santiago involuntarily, the district court correctly denied the motion to suppress the statement as well.

AFFIRMED.