Revised March 9, 2001

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

--------------

m 00-40495

--------------

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JEFFREY CARL GRIMES,

Defendant-Appellant.

--------------------------

Appeal from the United States District Court
for the Eastern District of Texas

--------------------------

March 7, 2001

Before SMITH, POLITZ, and PARKER,
  Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Jeffrey Grimes appeals his conviction of possession of child pornography under 18 U.S.C. 2252(a)(4)(B).[1] He challenges the

--------------

[1] Section 2252(a)(4)(B) makes it unlawful
(continued...)

[1](...continued)
knowingly to possess three or more books, magazines, periodicals, films, video tapes, or other matter that contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or that was produced using materials that have been mailed or so shipped or transported, by any means including by computer, if (a) the producing of such visual de-
(continued...)

results of his jury trial on four fronts: that the evidence was insufficient; that the district court instructed the jury, as a matter of law, to find a fact essential to conviction; that the search and seizure of his computer violated his Fourth Amendment rights; and that the district court abused its discretion in admitting into evidence the contents of two sexually-explicit narratives. While disagreeing with Grimes on the first three issues and on his challenge to the narratives' probative value, we vacate and remand for a new trial after concluding that the narratives' prejudicial effect substantially outweighed their probative value.

## I.

On October 17, 1998, Grimes's wife brought his computer to a store in Paris, Texas, for repair, signing a check-in slip and authorizing repair work; the slip indicated the computer would not "boot up." Two days later, Kevin Watson, a repair technician, began working on the computer.

Watson testified that the computer would not power on until he had removed a large amount of dust from the fan. When he then performed a standard check of the hard drive to see whether the computer had other problems, he discovered that the hard drive was low on space. After attempting but failing to contact Grimes by phone, Watson reached Grimes's wife and advised her of the problem, suggesting either the purchase of a new hard drive or allowing him to remove temporary files, temporary Internet files, and other files not needed on the computer.

Mrs. Grimes gave permission for Watson to remove files but said she would speak with Grimes before approving a new hard drive. Watson then began deleting temporary Internet files. He testified that he looked for "JPG" files,[2] which are picture files that consume a lot of hard drive space.

After locating "JPG files," Watson continued to follow his standard approach by opening the files to ensure, before deleting the pictures, that they were not personal to the computer owner.[3] While opening JPG files, Watson found approximately seventeen that contained the images of young, naked girls, perhaps six to ten years of age, with pixel boxes[4] over their "private areas."[5] Thinking

_____

[1](...continued)
piction involved the use of a minor engaging in sexually explicit conduct; and (b) such visual depiction was of such conduct. "Sexually explicit conduct," as that term is contemplated by § 2252-(a)(4)(B), includes actual or simulated "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(E).

The statute was amended in 1998 to criminalize the possession of one, vice three, visual depictions. Pub. L. 105-314 § 203(a)(1). Grimes's actions were committed before the effective date of the amendment.

[2] Watson's testimony included a well-vetted explanation that the search he performed to locate JPG files is one that searches all directories to find such files and does not just pull files from a specific directory. Watson suggested that this approach is also his common practice.

[3] For instance, if the images were JPG files in the user's temporary Internet files ("TIF's"), they might be pictures from a public site that the user had visited. As a technical point, only images that have appeared, at one time, on the computer screen become TIF's.

[4] The pixeled pictures have part of the picture intentionally blurred or obscured electronically. A
(continued...)

2

that the images might be "illegal," Watson called his supervisor, Robert Slider, and showed him the images. Slider, in turn, thought the images might constitute child pornography, so he reported the matter to police detective Danny Huff.

Huff came to the store and viewed the seventeen images that Watson had found originally; Watson showed him only the previously-found images. Without requesting Watson or Slider to search the computer any further, Huff reported the findings to FBI Special Agent Ken Paith.

Slider copied the seventeen images onto a floppy disk, which he gave to Huff, who copied them before faxing them to Paith, who seized the computer after obtaining a search warrant.[6] Paith then delivered the computer to the FBI office in Dallas, where its contents were reviewed by FBI computer specialist Guelda Lambert.

## II.

Grimes was tried on a superseding indictment that charged him with one count of possession of three or more sexually explicit visual depictions of minors. Specifically, he was charged with possession of thirteen computer graphic files, each of which contained one image. Lambert further testified that Government Exhibits 5(a) through 5(*l*) were extracted from Grimes's computer. Lambert testified that the images were stored three subdirectories down in the computer, in a directory called "My Briefcase," which was in a directory called "Desktop," which was in Windows.

Mike Marshall testified for the government as an expert witness in the general fields of computers and the specific computer applications of "DOS," "Windows," "Windows 95," E-Mail, the Internet, and functions within those systems such as "My Briefcase." As part of the government's investigation, Lambert had provided Marshall with a disk containing the contents of Grimes's hard drive. Marshall confirmed that the series of images in Exhibits 5(a) through 5(*l*) had been stored in the subdirectory "My Briefcase." This testimony would be important in demonstrating that the pictures were not somehow accidently on the user's computer; multiple inputs are required to place files into the subdirectory in which the pictures were discovered.

_____

[4](...continued)
common example of pixel-manipulation is when a person's face is blurred, with what often look like "fuzzy squares," on a television screen, so as to obscure his identity from the viewer.

More technically, a pixel is the smallest discrete element of an image, picture, television screen, or computer monitor (usually a single-colored dot). It is a set of bits that represents a graphic image, with each bit or group of bits corresponding to a pixel in the image. The greater the number of pixels per inch, the greater the resolution. A rough analogy to painted art is that a pixel is the same as each colored dab of a pointillist painting.

[5] Not all the government exhibits involved pixeled genitalia. In a few, the girls were nude; in at least one photograph, the girl's vagina was fully exposed, with a narrow band of pixels obscuring the center of her "private area" but not the entire area. In others, larger pixel boxes were used.

_____

[6] Grimes attacks the warrant as improper because it was based on an illegal search and seizure. His motion to suppress was denied.

Marshall testified that each of these images was stored in the subdirectory at a different time and in the "JPG format." He also stated that the series of images contained in Exhibits 5(a) through 5(*l*)[7] all depicted unclothed, young female children with pixel boxes over their genitalia, which boxes were generated by a computer on the images after the pictures were taken. In his opinion, the girls were naked and had their genitals exposed when the pictures were taken[8]

Marshall also identified Government Exhibits 7a, 8a, and 8b, which were images of young girls who were either nude or partially nude. He testified that these images were retrieved from the "temporary Internet files" in Grimes's computer. Marshall explained that a "temporary Internet file" is created when any of the Windows operating systems is installed with an Internet Browser. This temporary cache is a "first in first out" algorithm in which the files most recently viewed on the Internet by the end user remain in storage for quick recall. The images contained in Exhibits 7a, 8a, and 8b were viewed on the Internet by the end user.

Marshall identified Government Exhibits 12 and 13, which are paper copies of a narrative or story. Exhibit 12 is entitled "Torture Horse,"[9] and Exhibit 13 is entitled "Too Young." Exhibits 12 and 13 were downloaded by the computer's end user and stored in the temporary Internet file. Marshall could not tell whether the end user had read either of them.

Grimes sought to suppress these narratives as violative of Federal Rule of Evidence 404(b). The district court, after reconsideration, allowed their admission to demonstrate intent and state of mind. Brief passages from these narratives were read to the jury.

The jury also heard testimony from Paith regarding his conversation with Grimes at Grimes's residence. During what appears to have been only a brief discussion, Grimes admitted that he was the chief user of that computer, that he spent approximately three to four hours per day using it to access the Internet, and that he had accessed Internet sites that contained pictures of nude, young girls. Grimes sought to suppress this conversation, claiming that the interview had been custodial in nature.

Dr. Clyde Shaw, a pediatric physician, also testified as an expert witness for the government. He stated that the girls depicted in Exhibits 5(a) through 5(*l*) were under the age of eighteen. Based on his twenty-five

---

[7] Marshall also identified Government Exhibit 6, which contained a series of images (not charged in the second superseding indictment) similar to those in Exhibits 5(a) through 5(*l*) and stored on the "My Briefcase" subdirectory. Marshall also established that the computer had searched the Internet for news groups using the search criteria of "alt.japanese.neojapan.lolita" and that there were at least fifty successful "hits." "Lolita" is often a code word for child pornography.

[8] The girl in Exhibit 5k was not completely naked. Her panties were halfway between her knees and hips.

[9] The passage read from "Torture Horse" involved two eleven-year-old girls and a ten-year-old girl being sexually abused and tortured by an older man. The passage read from "Too Young" involved a fourth-grade girl who was forced to perform sexual acts on a security guard.

years' experience, he believed that many of the children in those exhibits were prepubertal or in early puberty and it is atypical behavior for children of this age to display their naked bodies.

### III.

Grimes argues that the presence of the pixel boxes prevents, as a matter of law, the nude photographs of the minor girls from meeting the statute's definitional requirements. First, he asserts that because the genitals were blocked out, the photographs fail to meet the definition of "lascivious." Second, and along the same lines, he argues that because the genitals are blocked out, they are not "exhibited."

In interpreting the statute, courts begin and end with the text if it is unambiguous and does not lead to an absurd result.[10] As we have said, § 2252(a)(4)(B) makes it unlawful "knowingly [to] possess three or more books, magazines, periodicals, films, video tapes, or other matter . . . if (a) the producing of such visual depiction involved the use of a minor engaging in sexually explicit conduct; and (b) such visual depiction was of such conduct." There are two questions: Did the production involve the use of a minor engaging in sexually explicit conduct, and was the visual depiction a depiction of such conduct?[11]

This circuit, when determining whether a visual depiction of a minor constitutes a "lascivious exhibition of the genitals or pubic area" under § 2256(2)(E), applies the six-factor test of *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd*, 813 F.2d 1231 (9th Cir. 1987), which we adopted in *United States v. Carroll*, 190 F.3d 290, 297 (5th Cir. 1999) (citing *United States v. Knox*, 32 F.3d 733, 7846 n.10 (3d Cir. 1994)), *vacated and reinstated in relevant part*, 227 F.3d 486, 488 (5th Cir. 2000) (per curiam). The factors are:

1. whether the focal point of the visual depiction is on the child's genitalia or pubic area;

2. whether the setting of the visual depiction is sexually suggestive, i.e. in a place or pose generally associated with sexual activity;

3. whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4. whether the child is fully or partially clothed, or nude;

5. whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6. whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Id.* (citing *Knox*, 32 F.3d at 746). The list is not exhaustive, and no single factor is disposi-

---

[10] *Darby v. Cisneros,* 509 U.S. 137, 147 (1993); *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253 (1992); *Rubin v. United States,* 449 U.S. 424, 429-30 (1981).

[11] The second prong narrows the statute. For instance, a child could be used in the production of a photograph, but the image in the ultimate photograph could be one that did not capture the child engaging in sexually explicit conduct. If this were so, a defendant might be charged under a
(continued...)

[11](...continued)
different statuteSSperhaps child molestationSSbut not child pornography.

tive. *Id.*

After viewing the photographs, we reject Grimes's challenge to the sufficiency of the evidence. It is plain to any viewer that the producing of these visual depictions involved the use of minors engaging in sexually explicit conduct and that the visual depiction captured that activity.

Grimes answers by saying that post-production computer alterations brought the photographs outside the statute's reach. That, however, is not what the plain language requires.

The scienter requirement of subsection (1) is applied to the entire clause.[12] Even were

the statute to be written as Grimes wishes it were, courts have treated the words "lascivious" and "exhibition" as a phrase. *Knox*, 32 F.3d at 745. Interpreting individual words in context is a common approach in statutory construction. *See Deal v. United States*, 508 U.S. 129 (1993) (observing that it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used").[13]

To aid in its interpretation, the *Knox* court considered the purpose behind that statute. It also applied a plain language analysis to determine that nothing in the statute required "nudity." The *Knox* court reasoned:

> . . . Congress aimed the federal child pornography statute at combatting "the use of children as subjects of pornographic materials[, which] is harmful to the physiological, emotional, and mental health of the child." *New York v. Ferber*, 458 U.S. 747 (1982). In so doing, Congress defined the "lascivious exhibition of genitals or pubic area" as one variety of "sexually explicit conduct" proscribed by the statute. Thus, we find

---

[12] *United States v. Brown*, 25 F.3d 307 (6th Cir. 1994) (holding that statute criminalizing receipt of child pornography was constitutional, because it included scienter requirement as to nature and character of proscribed materials); *United States v. Schmeltzer*, 20 F.3d 610 (5th Cir. 1994) (holding that statute prohibiting possession of pornographic materials depicting children was constitutional as applied to defendant who admitted that he knew the items he possessed depicted minors); *United States v. Burian*, 19 F.3d 188 (5th Cir. 1994) (holding that statute prohibiting knowingly receiving in the mail visual depictions of minor children engaged in sexually explicit conduct was not unconstitutional as applied to defendant who ordered through the mail sexually explicit material depicting teens, despite defendant's contention that statute did not require knowledge of performer's minority as element of crime it defined; statute did require such knowledge, and defendant knew that tapes he possessed depicted minors engaged in sexually explicit conduct); *United States v. Gendron*, 18 F.3d 955 (1st Cir. 1994) (concluding that "knowingly," as used in child pornography statute, modified entire clause in (continued...)

[12](...continued)
which it appeared, including parts of clause that referred to conduct and age of persons depicted in materials; thus, statute did not unconstitutionally fail to include scienter requirement).

[13] Although they are not before us, we can imagine situations in which a person came into possession of a picture that was so altered and so changed that he could not discern that the production had involved a minor engaged in sexually explicit conduct. In such a case, the government might not be able to prove knowledge.

6

it more meaningful to focus on the ordinary meaning of the statutory term "lascivious exhibition," rather than simply focusing on the term "exhibition" divorced entirely from the context in which it was used.

The term "lascivious" is defined as "[t]ending to excite lust; lewd; indecent; obscene; sexual impurity; tending to deprave the morals in respect to sexual relations; licentious." Black's Law Dictionary 882 (6th ed. 1990). Hence, as used in the child pornography statute, the ordinary meaning of the phrase "lascivious exhibition" means a depiction which displays or brings forth to view in order to attract notice to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer. Such a definition does not contain any requirement of nudity, and accords with the multi-factor test announced in United *States v. Dost* for determining whether certain material falls within the definition of 18 U.S.C. § 2256(2)(E). Nor does such a definition contain or suggest a requirement that the contours of the genitals or pubic area be discernible or otherwise visible through the child subject's clothing.

*Knox*, 32 F.3d at 745-46.[14]

The same court specifically rejected the characterization of *United States v. Villard*, 885 F.2d 117 (3d Cir. 1989) that Grimes urges to us. He asserts that *Villard*'s logic suggests that the statutory term "pubic area" is analogous to the medical meaning. The Third Circuit disagrees and characterizes *Villard*'s holding as "the obvious principle that nudity alone is insufficient to constitute lascivious exhibition." *Id*. at 750. To hold otherwise would outlaw many works of art or family photos of, say, naked children in bathtubs. *Id*.[15]

The *Knox* court stopped short of saying that the *Dost* factors are the only consideration. That court believed that, even without a requirement for nudity, the statute does require a threshold inquiry into whether the depiction visually exhibits the genitals or pubic areas. *Id*. at 751. That court considered the *Dost* factors useful in making this threshold inquiry, as we do. Again, however, our case is distinguishable from *Knox*, because in *Knox* the court faced a set of native photographs in which the production did not involve nude children, but, instead, minors wearing tight, revealing clothing. The *Knox* court faced a more difficult question than do we.

Even under a post-alteration analysis, the photos Grimes had in hand revealed ample exhibition and lasciviousness both to meet the threshold inquiry and to allow a reasonable juror to vote for conviction. Grimes would have us quibble with the jury's evaluation.

_____

[14] Later, the *Knox* court noted that were the statute found to be ambiguous, which it believed was not the case, then the legislative history, which shows that Congress explicitly removed the requirement for nudity from a draft, supported its holding. *Knox*, 32 F.3d at 748.

_____

[15] Grimes's brief contains a footnote explaining when nude photographs have not been found to be "obscene." Obscenity, however, is governed by a different inquiry, known as the *Miller* test. *See Miller v. California*, 413 U.S. 15 (1973). The purposes and language behind the relevant statutes support a continued distinction between these tests.

Although undoubtedly many cases involving computer-altered photographs of minors will follow this one, and such post-photograph computer manipulation will present courts with difficult factual and legal questions, the instant matter is not one of those cases.

To ignore the plain-meaning approach would undermine several of the statute's purposes, on which the Supreme Court has relied when discussing this statute and the issue of child pornography generally. The Court has recognized that the psychological effect of visually recording the sexual exploitation of a child is devastating, and its elimination is of "surpassing importance." *New York v. Ferber*, 458 U.S. 747, 757 (1982).

Additionally, controlling the production and dissemination of child pornography is of paramount importance, because pedophiles often use child pornography to seduce other children into performing sexual acts. *Osborne v. Ohio*, 495 U.S. 103, 111 (1990). These harms occur during the first stepSSthe photographing of the lasciviously exposed minorSSof what is later a computer-altered photograph. The *Knox* court, having considered these purposes, was persuaded that

> where the child is treated as a sexual object, the permanent record of this embarrassing and humiliating experience produces the same detrimental effects to the mental health of the child as a nude portrayal. The rationale underlying the statute's proscription applies equally to any lascivious exhibition of the genitals or pubic area whether these areas are clad or completely exposed.

*Knox*, 32 F.3d at 750.

IV.

Grimes claims that the district court instructed the jury that it must, as a matter of law, find a fact that was essential to conviction, to-wit, the lascivious exhibitions of the girls' genitals or pubic areas, had been established by the evidence. The court did not, in fact, instruct the jury to find a fact, nor did it disturb the written instructions it had read to the jury before the final arguments.

Grimes's contention is based on a portion of a comment, which he lifts out of context and in doing so misrepresents the court's remarks.[16] From our review, it seems the

---

[16] Grimes's complaint focuses on the "must have been engaged in" phrase in the following portion of the instruction:

> The Court: "Okay. Now, Mr. Rogers, I may need to stop you here because I think you're having two different arguments here and the Jury's going to have a question in their mind and I want to give you time to finish your argument here.
>
> Ladies and Gentlemen, what's required, if you'll look on page 7 of your instructions there, what's required is that the minors, if you find these persons in these photographs to be minors, must have been engaged in sexually explicit conduct at the time of the photograph.
>
> One of the definitions of 'sexually explicit conduct' is a lascivious exhibition of the genitals or pubic area of any person. So, the question is whether or not, at the time of the photograph, the minors, if they are minors, were engaged in the lascivious exhibition of their genitals or pubic areas.
>
> You'll have to decide whether or not,
> (continued...)

8

court merely attempted to make plain that there is a two-step inquiry: (1) Are the images of minors? (2) If so, the jury must also decide whether the minors were engaged in the lascivious exhibition of their genitals or pubic area. This was an aid, not an error.

### V.

Grimes sought to suppress the images, contending that they were seized in violation of the Fourth Amendment. He claims that the store's search went beyond the permission given by his wife, thereby invalidating any evidence that flows from the search. The initial search, being private in nature, is not subject to Fourth Amendment analysis, unless the private individual was acting as an agent of, or with the participation of, a government official. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (citing *Walter v. United States*, 447 U.S. 649, 662 (1980), and suggesting that any invasion of a defendant's privacy rights by law enforcement officers that occurs after a private search is tested by the degree to which it exceeds the scope of the private search).

In *United States v. Paige*, 136 F.3d 1012, 1018 (5th Cir. 1998), we discussed the two-part test for determining when a private party is a government actor under the Fourth Amendment: (1) whether the government knew or acquiesced in the intrusive conduct and (2) whether the private party intended to assist law enforcement efforts or to further his own ends. The computer store employees do

___

[16](...continued)
given the fact that there are computer generated pixels over the pubic area and genitals, whether or not, at the time they were photographed, they were engaged in this exhibition.

not meet this test.

First, the government was not involved in the initial discovery of the images. Second, when the private parties initially discovered the images, they did not act with the intent to assist law enforcement officials. The employees did, however, intend to aid officials after the discovery of the images and their initial belief in the images' illegality, but this is a different inquiry.

The next consideration is whether, after the private search, the person continues to possess a reasonable expectation of privacy. *Id.* at 1020. *Paige* involved a homeowner, in which case the expectation of privacy is often at its highest. As for a case with facts more analogous to ours, we consider *United States v. Hall*, 142 F.3d 988 (7th Cir. 1998), in which a computer repairman found child pornography and called police. When they arrived, the repairman showed the officer the items he had found. All of these items were admitted.

The pre-warrant images viewed by Huff and Paith were discovered during a private-party search, completed following standard company practice; were within the scope of the original private-party search; and were in an area where Grimes no longer possessed a reasonable expectation of privacy. For three reasons, then, the images are immune to Grimes's Fourth Amendment challenge.

### VI.

Grimes challenges the admission of the two sexually-explicit narratives, claiming they are stale and prejudicial. We review for abuse of discretion the admission of evidence pursuant to rule 404(b). *United States v. Bermea*, 30 F.3d 1539 (5th Cir. 1994).

Rule 404(b) states:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This court adopted a two-pronged inquiry in *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (en banc), which is now considered the settled approach. "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403." *Id.* at 911. Federal Rule of Evidence 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In applying the first prong of the *Beechum* test, courts first consider whether the evidence is relevant.[17] Where that evidence involves an extrinsic act, its relevancy under *Beechum* is a function of the degree of similarity between the extrinsic act and the offenses charged. This means more than the existence of a common characteristic. For purposes of the *Beechum* test, the common characteristic must be "the significant one for the purpose of the inquiry at hand." *United States v. Guerrero*, 650 F.2d 728, 733 (5th Cir. Unit A July 1981) (citations omitted).

Grimes asserts that the evidence failed both aspects of the *Beecham* inquiry. We disagree; the evidence was highly relevant, even probative as to three issues.[18] Unfortunately, it also was exceedingly prejudicial, because of its inflammatory nature.

The narratives were relevant, despite Grimes's offered stipulation, which came after the government convinced the district court to change its mind and admit the narratives, that the images did not belong to anyone else. Normally, if intent is not at issue, then extrinsic evidence is not admissible. *United States v. Roberts*, 619 F.2d 379, 383 (5th Cir. 1980). But, the defendant must affirmatively remove the issue of intent, not just promise not actively to contest the issue. *Id.*

Grimes also challenges the narratives' relevance by arguing that the time of one year between the downloading of the narratives and the pictures fatally reduces the narratives' probative value. Grimes's case survey on this is-

---

[17] To be relevant, evidence must tend to make the existence of some fact that is of consequence to the determination of the action either more or less probable than it would be without the evidence. FED. R. EVID. 401.

[18] The government was required to demonstrate that Grimes knew the images were of minors; that he knowingly possessed the images; and that it was he, and not a family member, who possessed them. The narratives would help show that the possession of the photographs was unlikely an accident when a person was also downloading narratives that involved sexual contact between adults and minors.

sue, however, is incomplete.

This circuit has had several opportunities to consider the effect of time on the probity of a piece of evidence. In *United States v. Byers*, 600 F.2d 1130 (5th Cir. 1979), we affirmed the admission of a relevant extrinsic offense that had occurred one month before the charged offense. Another example is *United States v. Hitsman*, 694 F.2d 443 (5th Cir. 1979), in which we affirmed admission of a college transcript and a conviction of the sale of marihuana, both of which were two or three years before the charge at issue. Ten years, however, was too great a gap in time.[19] In light of our precedent and the statute's elements, the narratives were relevant.[20]

Grimes also objected to the second *Beecham* inquiry, prejudice. The court admitted that the narratives were prejudicial and even noted that they were of a different sexual na-

---

[19] *See United States v. Carter*, 516 F.2d 431 (5th Cir. 1975) (holding that five illicit liquor offenses could not be admitted to show specific intent to violate an internal revenue liquor law).

[20] Grimes also complains that Marshall testified that he could not be certain whether the narratives had been read. This raises a proof-of-extrinsic-offense issue. Unlike owning the photographs, owning the narratives was not an offense. Normally, even where extrinsic evidence involves an offense, the government need only produce evidence that would withstand a directed verdict on the extrinsic offense. *United States v. Jimenez*, 613 F.2d 1373 (5th Cir. 1980) (citing *Byers*).

The nature of TIF's suggests there was "some" evidence that Grimes read these narratives. While users may not know that TIF's are created, that occurs only once an item appears on the user's screen.

ture from the photographs: The narratives depict violent rapes and moderate torture, while the photographs, though coerced,[21] depict no violence. The government defended that the potential prejudice was mitigated, because possessing the narratives is not a criminal offense. Normally, the danger of a jury's reprisal for unpunished extrinsic activity is likely to be less when the activity is merely "bad" and not criminal. *Beecham*, 582 F.2d at 914 n.17.

Having read the narratives, we cannot agree with the district court's decision and are unpersuaded by the government's argument. The narratives are vile in their graphic and violent nature: young girls in chains, a young girl in handcuffs, and references to blood, for example. Perhaps on retrial the government can redact a different portion of the narratives and attempt to reintroduce them. Should it attempt to do so, it should be wary of introducing gruesome violence, in light of the fact that the charged pictures are non-violent in nature.

We announce no generalization concerning whether it is ever appropriate to introduce such evidence, for in some cases the government may have no other source of extrinsic evidence to prove elements of the offense. Perhaps then, the balance between relevance and prejudice will tilt in the other direction. *See United States v. Goodwin,* 492 F.2d 1141 (5th Cir. 1974). In this instance, however, using the appropriate balancing test, the "probative value is substantially outweighed by the danger of unfair prejudice." Rule 403.

The judgment is VACATED, and this mat-

---

[21] By the very fact that the photographs involve minors, who are unable to consent, the photographs are "coerced."

ter is REMANDED for further proceedings consistent with this opinion.