# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-1504

_____

United States of America

*Plaintiff - Appellee*

v.

Guy Edward Wheelock

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 10, 2014
Filed: November 20, 2014

_____

Before RILEY, Chief Judge, WOLLMAN and BYE, Circuit Judges.

_____

RILEY, Chief Judge.

After law enforcement used an administrative subpoena to match Guy Edward Wheelock to a computer that downloaded child pornography through peer-to-peer software, Wheelock pled guilty to receiving child pornography in violation of

18 U.S.C. § 2252(a)(2) and (b)(1). The district court[1] sentenced Wheelock as a repeat offender to a mandatory minimum of fifteen years imprisonment. Wheelock challenges both the use of an administrative subpoena to obtain his internet service subscriber information and the constitutionality of his mandatory minimum sentence. We have appellate jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291, and we affirm.

## I.    BACKGROUND

Using investigative software, Officer Dale Hanson, of the Minneapolis Police Department, learned child pornography was available for download from a certain Internet Protocol (IP) address with Comcast Communications (Comcast) as the Internet Service Provider (ISP). Pursuant to Minn. Stat. § 388.23, Officer Hanson requested an administrative subpoena from the Hennepin County Attorney ordering Comcast to produce subscriber information associated with the identified IP address. Officer Hanson certified the information sought was "relevant to an ongoing, legitimate law enforcement investigation of Distribution of Child Pornography."

The Hennepin County Attorney faxed Comcast an administrative subpoena ordering Comcast to produce the requested information. Comcast responded, providing Wheelock's name, address, and other information. Officer Hanson checked this information against the Minnesota sex offender registry, which revealed Wheelock's prior conviction for possessing child pornography.

Using this information, Officer Hanson obtained a search warrant for Wheelock's house, the execution of which disclosed several hard drives, DVDs, and CDs containing child pornography, as well as a computer actively downloading

---

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota, adopting the report and recommendation of Magistrate Judge Tony N. Leung as to the suppression issue.

suspected child pornography video files using Shareaza, a peer-to-peer file-sharing program.

After being charged with possessing, receiving, and attempting to distribute child pornography in violation of 18 U.S.C. § 2252(a)(2), (a)(4)(B), (b)(1), and (b)(2), Wheelock moved to suppress all evidence obtained as a result of the administrative subpoena. He contends the subpoena violated the Fourth Amendment of the United States Constitution and federal and state statutes. Adopting the magistrate judge's report and recommendation, the district court denied the motions. Wheelock then conditionally pled guilty to receiving child pornography, preserving the suppression issue.

Before sentencing, Wheelock objected to 18 U.S.C. § 2252(b)(1) imposing a statutory mandatory minimum of fifteen years in prison for repeat offenders. Among other assertions, Wheelock argued this mandatory minimum is unconstitutional because it arbitrarily punishes receipt more than possession. The district court disagreed, concluding the statute survives a rational-basis inquiry. Wheelock timely appealed.

## II. DISCUSSION
### A. Administrative Subpoena

Wheelock first challenges the district court's denial of his motions to suppress, contending, as he did in the district court, Officer Hanson's use of an administrative subpoena violated the Fourth Amendment and federal and state statutes. "'When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo.'" United States v. Suing, 712 F.3d 1209, 1211-12 (8th Cir. 2013) (quoting United States v. Anderson, 688 F.3d 339, 343 (8th Cir. 2012)).

## 1. Fourth Amendment

Wheelock argues the use of an administrative subpoena (as opposed to a warrant) violated his Fourth Amendment privacy interest in the subscriber information obtained from Comcast. To prove he had a constitutionally cognizable privacy interest, Wheelock "must show that (1) he 'has a reasonable expectation of privacy in the areas searched or the items seized,' and (2) 'society is prepared to accept the expectation of privacy as objectively reasonable.'" United States v. James, 534 F.3d 868, 872-73 (8th Cir. 2008) (quoting United States v. Hoey, 983 F.2d 890, 892 (8th Cir. 1993)).

"'[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.'" United States v. McIntyre, 646 F.3d 1107, 1111 (8th Cir. 2011) (quoting United States v. Miller, 425 U.S. 435, 443 (1976)). This principle is dispositive here. With Comcast in possession of his subscriber data, Wheelock cannot claim a reasonable "'expectation of privacy in [the] government's acquisition of his subscriber information, including his IP address and name from third-party service providers.'" Suing, 712 F.3d at 1213 (alteration in original) (quoting United States v. Stults, 575 F.3d 834, 842 (8th Cir. 2009)); accord United States v. Perrine, 518 F.3d 1196, 1204-05 (10th Cir. 2008) ("Every federal court to address this issue has held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation.").

Wheelock questions the logic and ongoing viability of the third-party disclosure principle in its current form by attempting to construct a Supreme Court majority from the concurrences in United States v. Jones, 565 U.S. ___, 132 S. Ct. 945 (2012). Wheelock weaves Justice Sotomayor's interest in revisiting the third-party principle, see Jones, 565 U.S. at ___, 132 S. Ct. at 957 (Sotomayor, J.,

-4-

concurring) ("[I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. This approach is ill suited to the digital age."), with Justice Alito's (joined by Justices Ginsburg, Breyer, and Kagan) recognition that Fourth Amendment doctrine may need to adapt to the demands of rapid technological advancement, see, e.g., id. at ___, 132 S. Ct. at 962 (Alito, J., concurring). In Wheelock's view, the concurrences "illustrate the way in which the Court will decide privacy cases in the future." Time may prove Wheelock right, and the Supreme Court may revise its view on third-party disclosures in the digital context, but until then, we are bound by precedent, and the actual majority opinion in Jones did not address the third-party disclosure doctrine, let alone purport to desert or limit it. Of the separately concurring justices, it was only Justice Sotomayor who voiced any dissatisfaction with the doctrine, and even then, she did not outright advocate its abandonment. See id. at ___, 132 S. Ct. at 957 (Sotomayor, J., concurring).

Relying heavily on Justice Alito's concurrence, Wheelock also argues Minnesota's internet privacy statutes create a reasonable expectation of privacy in Wheelock's identifying information because Minnesota prohibits ISPs from "knowingly disclos[ing] personally identifiable information concerning a consumer," Minn. Stat. § 325M.02, including information identifying the "consumer by physical or electronic address," id. § 325M.01, subd. 5(1). "'[W]hile state statutes and regulations may inform our judgement [sic] regarding the scope of constitutional rights, they fall far short of the kind of proof necessary to establish a reasonable expectation of privacy.'" Eagle v. Morgan, 88 F.3d 620, 626 n.3 (8th Cir. 1996) (quoting Nilson v. Layton City, 45 F.3d 369, 372 (10th Cir. 1995)). "Quite to the contrary," the precept of privacy from unreasonable searches "achieve[s its] scope from 'deeply rooted notions of fundamental personal interests derived from the Constitution.'" Id. at 626 (quoting Nilson, 45 F.3d at 372). Plus, to the extent Minnesota statutes are relevant, Wheelock could not have reasonably expected § 325M.02 to protect his subscriber information given that law's provisions *requiring*

the disclosure of information "to an investigative or law enforcement officer . . . while acting as authorized by law" and information requested in "an administrative subpoena, issued under authority of a law of this state," id. § 325M.03(2), (6).

Because Wheelock had no reasonable expectation of privacy in the subscriber information, a warrant was not necessary. See Suing, 712 F.3d at 1213.

### 2.      Subpoena Statutes

Wheelock also contends Officer Hanson failed to follow proper procedure under both federal and Minnesota administrative subpoena statutes. First, the requirements in 18 U.S.C. § 3486 apply only to federal subpoenas and not to the subpoenas in this case—obtained pursuant to state law and issued by a state actor. See 18 U.S.C. § 3486(a)(1)(A) (discussing subpoenas issued by certain federal officers).

Second, the Minnesota subpoena statute allows a county attorney to issue administrative subpoenas only "for records that are relevant to an ongoing legitimate law enforcement investigation." Minn. Stat. § 388.23, subd. 1. Wheelock claims Officer Hanson violated this requirement by failing to provide a factual basis in his subpoena request from which the signing attorney could have made a "determination as to the legitimacy of the law enforcement investigation." First, Officer Hanson requested retrievable information and certified "that the requested records [were] relevant to an ongoing, legitimate law enforcement investigation of Distribution of Child Pornography." This is all the statute requires. Second, a violation of state subpoena procedures "would not warrant suppression of the evidence gained because federal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as the search complied with the Fourth Amendment." United States v. Bach, 310 F.3d 1063, 1066 (8th Cir. 2002).

Thus, neither statute warrants suppression.

**B.      Sentence**

Wheelock also challenges his sentence, arguing 18 U.S.C. § 2252(b)(1)'s fifteen-year mandatory minimum for repeat offenders violates the Due Process Clause of the Fifth Amendment of the United States Constitution because it arbitrarily sets a minimum sentence for receipt of child pornography five years higher than the ten-year mandatory minimum § 2252(b)(2) imposes on the same offender for possession. "Once a person has been convicted of a crime in accordance with constitutional guarantees, determining the severity of his punishment is, in the first instance, a legislative task." United States v. Meirick, 674 F.3d 802, 805 (8th Cir. 2012). We must remain "highly deferential to legislative judgments about the most effective way to protect the public from convicted criminals." Id. To succeed, Wheelock must show Congress's "line-drawing" between possession and receipt was "totally arbitrary" under a "rational basis" inquiry.[2] Id.

Wheelock primarily contends there is little difference between possession and receipt and that in the vast majority of cases, defendants convicted of possession are also guilty of receipt. He adds that recent technological advances have removed any other justifiable distinctions that may once have existed between the two offenses.

Initially, we note the distinction is not meaningless simply because knowing receipt and knowing possession overlap in the *usual* case. Yet the underlying point—that possession necessarily requires receipt (if not production) of the possessed material—merits additional consideration. See, e.g., United States v. Richardson, 238 F.3d 837, 839 (7th Cir. 2001) ("The puzzle is why receiving, which under the first guideline and the statute that it implements is punished as severely as sending, should be punished more severely than possessing, since possessors, unless they fabricate their own pornography, are also receivers." (internal citations omitted)).

---

[2]Wheelock makes no claim the disparity is "based upon an impermissible factor such as race." Meirick, 674 F.3d at 805.

Possession of child pornography, while heinous in its own right, does not necessarily spread the harm beyond the possessor himself, whereas "receiving materials that have been shipped in interstate commerce is conduct more closely linked to the market for child pornography." United States v. Watzman, 486 F.3d 1004, 1009 (7th Cir. 2007). This closer link to the market and its attendant harms is important because "[a] person who receives these images 'furthers the market . . . *whether or not* the person retains them.'" United States v. Sturm, 673 F.3d 1274, 1279 (10th Cir. 2012) (quoting United States v. Davenport, 519 F.3d 940, 949 (9th Cir. 2008) (Graber, J., dissenting)); accord United States v. Ellison, 113 F.3d 77, 81 (7th Cir. 1997) (noting that "even the receipt of [child pornography] for personal use, without more, keeps producers and distributors of this filth in business"). "'Indeed, even a person who receives the images and never gets around to viewing them still causes these harms.'" Sturm, 673 F.3d at 1279-80 (quoting Davenport, 519 F.3d at 949 (Graber, J., dissenting)). Possession alone, however, does not necessarily contribute to the market, and "[b]ecause the harms flowing from possession of child pornography differ from those associated with distribution and receipt, differentiating levels of punishment should not be unexpected." Id. at 1280.

Wheelock seems to suggest the two crimes cannot be so easily separated because the receiver of a thing will always possess it (even if only briefly) and the possessor will always receive (or produce) it. This argument overlooks *mens rea*. The fact that a knowing possessor received or produced pornography does not necessarily mean he did so "knowingly," as required by the statute. 18 U.S.C. § 2252(a)(2), (4). "It is possible to unwittingly receive child pornography and then knowingly continue in possession of it; likewise, one can knowingly receive child pornography and then cease possession."[3] Sturm, 673 F.3d at 1280; accord Watzman,

---

[3]However, the knowing receiver who promptly discards the material is necessarily guilty of knowingly possessing it for some brief period. See United States v. Muhlenbruch, 634 F.3d 987, 1003 (8th Cir. 2011) ("[P]roof of receiving child pornography under § 2252(a)(2) necessarily includes proof of illegal possession of

-8-

486 F.3d at 1009-10 ("[A] person who receives child pornography by accident (for example, if he sought adult pornography but was sent child pornography instead) is not guilty of knowingly receiving it, though he is guilty of possessing it if he retains it."). Only the person who intentionally obtains child pornography—whether by purchase or through peer-to-peer software—willingly participates in trafficking child pornography,[4] making that person the more deliberate, active promoter of the market and the harms it creates and furthers, see Watzman, 486 F.3d at 1010.

Because knowing possession is not knowing receipt and each act threatens distinct harms, the imposition of different mandatory minimums is not irrational. Wheelock's challenge must therefore fail.[5]

_____

child pornography under § 2252(a)(4)(B).").

[4]Wheelock also seems to suggest receipt is not as reprehensible as it once was because most receivers of child pornography do not pay for it and therefore "do not financially contribute to the commercial child pornography industry anymore." But the crime of receipt is not limited to commercial transactions, and Congress has long since removed any "sale" requirement based, in part, "upon Congress's determination that 'much if not most child pornography material is distributed through an underground network of pedophiles who exchange the material on a non-commercial basis, and thus no sale is involved.'" Sturm, 673 F.3d at 1279 (quoting H.R. Rep. No. 99-910, at 4 (1996), reprinted in 1986 U.S.C.C.A.N. 5952, 5954). In any case, even a peer-to-peer user who downloads child pornography furthers the "market" for it. Peer-to-peer file-sharing software enables a communal network which "exist[s]—as the name 'file-sharing' suggests—for users to share, swap, barter, or trade files between one another." United States v. Griffin, 482 F.3d 1008, 1013 (8th Cir. 2007). Receivers (via downloading) are also potential distributors (via uploading), meaning every download creates a new possible source of upload. This, and the network's encouragement to reciprocate the sharing, enhances its distribution capacity and promotes the production of additional pornography, not unlike a commercial market.

[5]Wheelock also attacks the calculation and severity of his sentencing guidelines range. Given that his fifteen-year sentence was the mandatory minimum, see 18 U.S.C. § 2252(b)(1), any deficiency in the guidelines was harmless, see 28 U.S.C. § 2111.

## III.  CONCLUSION

For the reasons stated, we affirm.

_____